## CHARLES J. CLARK *vs.* DANIEL JAGGER.

Seamen in the whaling service who receive as wages a certain proportion, or lay, of the ship's catchings, do not thereby become partners or tenants in common, with the master and owners of the vessel, in the products of the voyage; nor can they exercise any control over such products, during the continuance of the voyage.

The master may inflict punishment on a seaman for disobeying his lawful commands; but the punishment must be such as is reasonable and necessary under the circumstances of the case; and if cruelty is exercised, or if the punishment is grossly oppressive and disproportioned to the offense, the master becomes a trespasser.

The master may imprison a seaman in a foreign jail, where there is a positive necessity for the peace or safety of the ship that the offending party should be removed to a place of safe keeping on shore.

This was an action of trespass, brought to recover damages against the defendant, who was captain of the American ship "Emerald," for injuries alleged to have been inflicted upon the plaintiff, who was cooper of said ship.

It was in evidence that the "Emerald" left Sag Harbor, in the year 1851, on a whaling voyage to the Pacific and Arctic Oceans, " *to continue for four years, or until the return of said ship to a port of discharge in the United States.*" In October, 1853, the "Emerald" put into the port of Honolulu, wanting 1000 or 1200 barrels of being full; and Captain Jagger, having concluded to try another season in the Arctic, made arrangements to send part of his oil home in the "Montauk," and ordered his men, among whom was the plaintiff, to tranship it to the "Montauk." This order, the plaintiff and others refused to obey, on the ground that it was not a lawful command, inasmuch as the captain had no right to ship the oil without their consent. The captain then applied to Mr. Angell, the United States Consul, for assistance, who immediately went on board the "Emerald" and remonstrated with the men, telling them that they were wrong in the matter, the ship not being full, and they having shipped for four years or until their return to the United States. He then left them to reflect upon the subject until the next day, when, finding they still persisted in their refusal to obey the master's command, he ordered them to be handcuffed and kept on board. Subsequently, on the complaint of the captain, that the plaintiff and others were interfering with laborers who were engaged in the discharge of the oil, and thereby disturbing the peace of the ship, he ordered the plaintiff and others to be brought on shore and confined in the Fort, where they were imprisoned for fourteen days. It was for this confinement in irons on board, and imprisonment on shore, that the plaintiff brought his action for damages.

Messrs. Blair and Montgomery, on behalf of the plaintiff, contended that the captain had no right to order the oil to be discharged for shipment to the United States, and that, under the articles, the men were not bound to obey such a command. Consequently his ironing and imprisoning of them was a despotic act, for which he should be made to suffer in heavy damages; and moreover, that even granting the command to have been lawful, still the plaintiff was entitled to damages, inasmuch as the defendant had punished him with unnecessary and cruel severity.

Messrs. Bates and Harris contended on the part of the defendant, that the plaintiff was bound by the Shipping Articles to remain with

the ship four years; and during that time to obey all the lawful commands of the master. That the order to discharge and tranship oil for any purpose whatsoever, was a legal order, such as the crew had no right to disobey, and therefore, having placed themselves in the wrong, they could not justly complain of the punishment. That the punishment was not unusual or cruel, but such as was customary and necessary under the circumstances of the case; and that in any event, if wrong had been done, it was by the command of the American Consul, who stood ready and willing to shoulder the responsibility.

CHIEF JUSTICE LEE charged the jury in substance as follows:

The first question which presents itself for our consideration in this case is, whether the command of Captain Jagger to discharge the oil into the "Montauk" was a lawful one. To determine this, it first becomes necessary to enquire, whether the crew of the "Emerald" had any property in, or control over the oil; for evidently they entertained the idea that part of the oil belonged to them; that they were joint owners and *quasi* partners in the catchings of the ship; and consequently ought to be consulted and allowed a voice in the shipping of the oil. In fact they subsequently stated as much to the master and American Consul, in saying they did not wish their oil shipped on board the "Montauk," as they did not wish to pay freight on it. That they entertained this idea of partnership in the oil is not to be wondered at, for it is a natural and common one; but at the same time one which has no foundation in law. The fact that seamen in the whaling service receive a certain proportion, or lay, as it is called, of the proceeds of the voyage in the lieu of wages, does not constitute them partners or tenants in common with the master and owners of the vessel in the oil which may be taken; and, during the continuance of the voyage, they have no voice or control over the disposition of that oil. "The owners of the vessel and projectors of the voyage," says Chief Justice Parker in the case of Baxter *vs.* Rodman, (3 Pick. R. 435, 438,) "are the owners of the product of the voyage. The true meaning of the shipping contract is, that the men shall be paid out of the proceeds in a stipulated proportion. It is an agreement as to the mode of compensation, and gives them no property in the oil, but only regulates the amount of compensation." It has been repeatedly decided by the Court of King's Bench, and the Supreme Court of Massachusetts, that the oil was the property of the owners of the vessel, and remained under their entire control, until there was some settlement or adjustment of the voyage. The right of the seaman is to have the oil sold and to recover a share of the proceeds, according to his lay as set forth in the Articles. It is understood, in practice, that, if an officer or seaman prefers to have his share in oil, he will be allowed to do so; but even in this case, the courts say, "it is clear he can have no property in the oil until separation and delivery." The seaman's lay or share in the proceeds of the voyage, says Judge Story, in the case of Coffin *vs.* Jenkins, (3 Story's R., 112,) "is in the nature of wages for seamen in the common merchant service, and is governed by the same rules." In no sense whatever can the seamen claim to be treated as partners with the owners of the vessel, and I consider the doctrine that they have no property in the oil which will allow them to exercise a control over it, during the continuance of the voyage, too firmly settled to admit of reasonable doubt.

P

But this doctrine of non-interference on the part of the crew in the disposition of the catchings, I believe not only to be good law but sound sense. To say that every seaman in a whaling voyage is a *quasi* partner in the concern, and has a right to say whether the oil shall be shipped home or remain in the vessel, would be to affirm a doctrine never dreamed of by the owners, and one which would introduce confusion and ruin into the whole business. Under such a rule the whaling business would be entirely impracticable.

In this case, the voyage was " to continue for four years, or until the return of the said ship to a port of discharge in the United States." The four years had not expired—the vessel had not returned to a port of discharge in the United States—she was not even full—and yet the plaintiff and others acting under the erroneous belief that they had a property in the oil, and that the captain had no right to compel them to tranship it, refused to obey his lawful command. In this they were wrong, and the captain had a right to punish them. But says the plaintiff, granting he had, still he should pay me damages, for he transcended the bounds of reason and necessity, and imposed upon me a cruel punishment, not called for by the circumstances of the case.

This brings us to the consideration of the master's authority over his crew, and the kind and degree of punishment he may inflict for a disobedience of his lawful commands. It has been truly said, that the master of a vessel holds a station, the responsibility of which has hardly a parallel in any other situation of civil life. He has to govern in good order a little world, and that too, under the most trying circumstances, and in the midst of terrible dangers. Upon his judgment, prudence, skill and courage, often depends not only the safety of the vessel and cargo, but the lives of all on board; and therefore, the law has clothed him with large authority and discretion in the command of his crew. The necessities of the case require that one mind, and not several, should both order and be responsible for the direction of affairs, and hence, he is invested with supreme authority over his crew, whose duty it is to obey his lawful commands in all matters relating to the government, business and navigation of the vessel. If they refuse to so obey, he may inflict punishment; but it must be such as is reasonable and necessary under the circumstances of the case; and if cruelty is exercised, or if the punishment is grossly oppressive and disproportioned to the offense, the master then becomes a trespasser, and will be liable to the seamen in an action for damages. While the law allows the master a wide margin in the government of his crew, and much latitude of discretion in the punishment necessary to enforce his commands, still, it watches over the exercise of that discretion with a jealous eye. It confines him to the bounds of due moderation, and if he exceeds those it withdraws its shield of protection. But it is said by the courts of the United States, that where the seaman is in the wrong, and it appears that some punishment is merited, the court will not undertake to adjust very exactly, according to its own idea of fitness and propriety, the balance between the gravity of the offense and the quantum of punishment, and will not award damages unless the punishment is manifestly excessive, or unlawful in its kind. In this case the punishment first inflicted on the plaintiff was imprisonment on board the ship by confinement in

irons; and the question is, was that a lawful punishment and proper under the circumstances? I think it was, and the captain cannot be held responsible for it, unless he exercised cruelty or unnecessary severity in its infliction. It is said that after handcuffing Clark he jerked back his arms and called for a pole to thrust between them and his back, and only desisted from carrying out his cruel intentions at the request of a midshipman belonging to the U. S. S. "Portsmouth," who went on board the "Emerald" to assist in reducing the crew to a state of subordination. If he had thrust the pole through, as it is said he threatened, I should be clearly of the opinion that he exceeded the proper bounds of moderation, but as he did not, it is doubtful whether he can be made to pay damages. As a general rule men cannot be held responsible in damages for wrong intentions, so long as they are not carried into execution.

But says the plaintiff, if the defendant committed no wrong in confining me in irons on board of the ship, still he had no right to bring me on shore and imprison me in a foreign jail. To this the defendant replies that he had no part in imprisoning the plaintiff in the Fort, but that it was done by the Marshal of the islands, upon the order of Mr. Angel, the American Consul. This is all very true, but the imprisonment was made upon the request of Captain Jagger, and I think he should bear the consequences of it, if he was in the wrong, and not seek to shift the responsibility on to other shoulders. The advice or order of the American Consul furnishes no protection to the captain in such a case, and he must rest his justification on the strong necessity of the case; and if this will not bear him out, he must fall. It is said that the law does not clothe the master with authority to imprison the seamen for disobedience, in the common jail of a foreign port ; and that the imprisonment, if necessary or proper, must be on board of the ship. My opinion, however, based in a great degree upon that of Judge Story's in the case of the United States *vs.* Ruggles, (5 Mason's R. 193,) is, that the law does invest the master with such authority, where there is a positive necessity for the peace or safety of the ship that the offending party should be removed to a place of safe-keeping on shore. But while I think that the master may in cases of strong necessity imprison a seaman in our jails, I am clearly of the opinion, that it cannot be justified, when a more moderate punishment on ship-board would be as effectual and safe. The idea so commonly entertained, and so generally practiced at these islands, that a captain of a ship may throw his crew into our miserable jail for the slightest offenses, is a most erroneous one; and it is high time that masters should understand that they cannot thus abuse their authority with impunity. Such imprisonment of seamen, says Judge Story, can only be resorted to in extreme cases, and "must be with the intent to take them again on board the ship for the voyage, or to bring them home; and not with the intent merely to punish them, and at the same time to dissolve their connection with the ship. The master can punish only to promote good discipline, and compel obedience to lawful orders on board of the ship."

The jury after a short absence returned a verdict for the defendant.

Mr. Blair and Mr. Montgomery for plaintiff.

Mr. Bates and Mr. Harris for defendant.